LEE LIME CORPORATION *vs.* MASSACHUSETTS TURNPIKE
AUTHORITY

(and a companion case between the same parties).

Berkshire. April 9, 1958. — May 1, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, WHITTEMORE, & CUTTER, JJ.

*Witness,* Expert witness. *Evidence,* Opinion: expert; Of value.

At the trial of a petition by a corporation for assessment of damages on account of a taking for the construction of an express highway of a portion of its land, most of which it used for the conduct of a plant manufacturing lime products and for the operation of a limestone quarry furnishing stone for the plant, there was no abuse of discretion on the part of the trial judge, after admitting the opinions of the president of the corporation and of the operator of a business similar to that of the corporation as to the value of the corporation's property for the purposes for which it was used, in excluding opinions of its value of two real estate brokers and appraisers, neither of whom had ever sold, appraised or operated a limestone plant or quarry.

Two PETITIONS, filed in the Superior Court on February 27, 1956, and March 20, 1956, respectively.

The cases were tried before *Smith,* J.

*J. Burke Sullivan,* (*Joseph P. Zajac* with him,) for the respondent.

*Frederick M. Myers, Jr.,* (*Edmund M. McCarthy* with him,) for the petitioner.

RONAN, J. These are two petitions brought under G. L. c. 79, § 14, for the assessment of damages against the respondent on account of two takings of the petitioner's land in the construction of a toll express motor vehicle highway as more fully set forth in St. 1952, c. 354. Although each parcel was taken at a different time, they were parts of a large parcel and were contiguous to each other and were taken for the same purpose. Both petitions were consolidated for trial in accordance with an agreement of the parties

and an order of the court. Both were tried together and resulted in a single verdict for the petitioner.[1]

The respondent concedes that it was proper for the judge to admit the testimony of one Deely, the president of the petitioner, and of one Brisch, who conducted a business similar to the petitioner's, as to their opinions of the value of the petitioner's land, buildings and equipment for the purpose for which the property was used. The respondent, according to its brief, states that the sole question is whether the judge erred in not permitting two real estate brokers to give their opinions as to the market value of the petitioner's property before and after the takings.

There was no error.

The petitioner's property lies in the town of Lee and was being used at the time of the takings for the conduct of a plant manufacturing lime products. On the property was a limestone quarry which furnished all the stone for the manufacturing plant. Operations had been conducted on the premises for about fifty years and at the time of the takings were being conducted at full or near full capacity. The manufacturing plant is a substantial steel and concrete structure and is a modern, up-to-date plant. The total land area comprised approximately 100 acres: 2,300 feet in length (north and south) and varying in width (east and west) from 2,100 feet at the south end to 900 feet at the north. The manufacturing plant and other buildings are located on the western edge of the land near railroad tracks of the New York, New Haven and Hartford Railroad and are approximately 300 feet south from the present site of the Massachusetts Turnpike. The northernmost two thirds of the property east of the manufacturing plant contains the quarry which covers approximately ten acres and, as developed at the time of the takings, had two branches. One branch ran 1,300 feet in a southerly direction from the northerly line of the property. The other branch ran in a southeasterly direction for 850 feet from the northerly line

---

[1] *Lumiansky* v. *Tessier*, 213 Mass. 182.

of the property. The southerly end of the property contains a swamp. The takings consisted of two contiguous parcels of land in the northern part of the property, 900 feet east and west and 160 feet north and south, totaling approximately three acres of land.

There was evidence that two to four primary blasts occur annually to loosen limestone from the face of the quarry and that fragments displaced amount to 40,000 tons; these primary blastings result in the dislodging of pieces of stone of various sizes "from dust to rocks half the height of the court room and almost as square." These fragments are then reduced in size by secondary blasting so as to permit them to pass through the crusher. These secondary blasts are an indispensable part of the quarry operations and a quarry could not be conducted nor could a lime plant be conducted without them. These secondary blasts number 15,000 to 20,000 a year and five per cent will throw stones for a distance of about 800 to 850 feet and are likely to reach the new highway. There was also evidence that "the fly rock" is uncontrollable and results in making unavailable a large area of the petitioner's land by its inability to conduct blasting operations within 800 feet of the new turnpike.

The respondent contends that only a small portion of the petitioner's original parcel was taken. It is true that the two takings amounted to three acres. The quarry covered ten acres. The photographs and plans show the location of the quarry, railroad tracks, spur tracks, storage piles, office and manufacturing plant and related buildings, waste piles, and abandoned quarries. The judge and the jury took a view. The jury could adopt the evidence as to the nature of the deposits of limestone remaining upon the petitioner's parcel and their location thereon, and the evidence of the reduction in amount of reserves actually left by the takings and the corresponding shortening of the life of the plant. There was also the area said to have been rendered unsafe for the continuance of secondary blasting. The jury could come to the conclusion that in one way or another most of the petitioner's parcel was used in connec-

tion with the quarry and manufacturing. All the estimates of value that were given related to the entire parcel and it was so left on the instructions to the jury to which no exceptions were taken.

Two witnesses, Tehan and O'Donnell, offered by the respondent as experts on real estate values, testified that they had made numerous appraisals of various types of property and had served on many real estate boards dealing with appraisals. Tehan also testified that he knew of no sales of operating lime plants except for an "RFC sale" which involved property which he did not believe manufactured burned lime as did the petitioner's plant. He further testified that he "wasn't familiar with the plant on this property." Both witnesses testified that they had never sold, appraised or operated a limestone plant or quarry. The respondent excepted to the refusal of the judge to allow them to testify to the value of the petitioner's property.

The general considerations in determining the qualifications of real estate experts, where the land is not commonly bought or sold in the current market but is peculiarly adapted and used for a special purpose, have been fully and adequately stated in *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authority*, 335 Mass. 189, 193–196, with ample citations. The only issue in the instant cases is whether there was an abuse of discretion in ruling that the two real estate appraisers were not competent to testify to the value of the land in question. *Muzi* v. *Commonwealth*, 335 Mass. 101. *Ford* v. *Worcester*, 335 Mass. 723. Ordinarily a real estate dealer or appraiser may testify as to the value of property, whether or not he has seen it or sold land in the neighborhood, if he possesses sufficient experience and knowledge of values of other similar real estate in the particular locality. *Bristol County Savings Bank* v. *Keavy*, 128 Mass. 298. *Amory* v. *Melrose*, 162 Mass. 556. *Lyman* v. *Boston*, 164 Mass. 99. *Teele* v. *Boston*, 165 Mass. 88. And it has been held to be reversible error not to permit such a witness to testify where he has shown sufficient knowledge

of and experience with the particular type of real estate involved in the litigation. *Muskeget Island Club* v. *Nantucket*, 185 Mass. 303. *Old Silver Beach Corp.* v. *Falmouth*, 266 Mass. 224. *Muzi* v. *Commonwealth*, 335 Mass. 101. *Ford* v. *Worcester*, 335 Mass. 723. But it is not sufficient that a real estate dealer or appraiser may have a general knowledge of real estate values. He should possess knowledge and experience regarding the particular type of property involved which will enable him to form an intelligent and fairly accurate estimate of the diminution in actual market value occasioned by the takings. *Beals* v. *Brookline*, 245 Mass. 20. *Maher* v. *Commonwealth*, 291 Mass. 343, 349. See *James Millar Co.* v. *Commonwealth*, 251 Mass. 457; *Young* v. *New York, New Haven & Hartford Railroad*, 273 Mass. 567, 572–573. The instant cases are controlled by *Klous* v. *Commonwealth*, 188 Mass. 149, where it was held that it was within the discretion of the trial judge to rule that a real estate dealer and engineer did not qualify as an expert to testify as to the value of the particular type of property involved. See *Cochrane* v. *Commonwealth*, 175 Mass. 299; *Conness* v. *Commonwealth*, 184 Mass. 541; *Tigar* v. *Mystic River Bridge Authority*, 329 Mass. 514; *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authority*, 335 Mass. 189.

*Exceptions overruled.*