EPSTEIN vs. HYTE, MISC 19-000228

































 
 ELLEN R. EPSTEIN and JAY M. EPSTEIN, Trustees of Rosalyn P. Epstein Irrevocable Trust, Plaintiffs, v. BARTON HYTE, EDWARD O. NILSSON, ROSSANA FERRANTE, and STEPHEN LEVERONE, As They Are Members of The PLANNING BOARD of the TOWN OF MARBLEHEAD; and ROBERT P. JACOBS and ROBERT P. JACOBS, Trustee of The 11 Crown Way Realty Trust, Defendants
 MISC 19-000228 
 FEBRUARY 1, 2021
NORFOLK, ss.
RUBIN, J.
DECISION














 The Plaintiffs, Ellen S. Epstein and Jay M. Epstein, Trustees of Rosalyn P. Epstein Irrevocable Trust, (the "Epsteins"), object to plans by their new neighbor Robert P. Jacobs to redevelop oceanfront property located at 11 Crown Way, Marblehead (the "Property"). The Property is owned by Robert P. Jacobs, both individually and as trustee of the 11 Crown Way Realty Trust ("Jacobs"). Jacobs together with his new wife selected the Property as the perfect place for them to build a home for their combined or blended families. The Epsteins, who grew up next door at 9 Crown Way and whose mother still lives there, take issue with design of the new home because they believe its massing will block ocean views from the Epstein home. The Epsteins filed a Complaint pursuant to Chapter 40A, § 17, challenging a decision of the Defendant Town of Marblehead Planning Board ("Planning Board") approving a site plan special permit for a new single-family home ("Decision"). On January 22, 2020, I took a view of the Property, the Epsteins' home and the neighborhood. The case was tried before me on January 23 and 24, 2020. 





 For the reasons stated below, I uphold the Board's Decision. In brief, I conclude the Project complies with Section 200-37 of the Zoning Bylaw of the Town of Marblehead ("Bylaw") which governs site plan special permits and the Project's design minimizes impacts on the Epsteins as abutters, the immediate neighborhood, and the Town. 





PROCEDURAL BACKGROUND 





 on April 23, 2019, the Board issued its Decision approving Jacobs' Application for a Site Plan Special Permit pursuant to Section 200-37 of the Bylaw ("Application"), whereby the existing house would be demolished ("Existing House") and a new home constructed on the Property. The Epsteins timely appealed pursuant to G.L. c. 40A, § 17, by filing a complaint in this court on May 9, 2019. Defendants do not challenge the Epsteins' standing to maintain this appeal. Plaintiffs contend that the Decision must be annulled and remanded to the Board for reconsideration because the Board failed to make findings sufficient to establish that the criteria for issuing a site plan special permit had been met and there was insufficient evidence to support the Board's finding that adverse effects on abutting lots were minimized, particularly the Epsteins' loss of ocean views. The Jacobs contend that the Board did not err in approving the Project. 





 In a Revised Joint Pretrial Memorandum, filed on January 17, 2020, the parties agreed that the issue for trial was whether the Board erred in approving the Site Plan Special Permit under Section 200-37 C of the Bylaw. On January 23, 2020, the first day of trial, the parties filed a Joint Stipulation of the Parties, further narrowing the issues for trial. Specifically, the parties agreed that the scope of their dispute was limited to certain criteria under Section 200-37 C and that no proof was required on the remaining criteria. Accordingly, the scope of the dispute for trial concerned only certain portions of the criteria for site plan special permits. Those portions of Subsections 3 (a) and (e) of Section 200-37 C are highlighted below for emphasis: 





 (a) The architectural and design features are in harmony with the prevailing character and scale of buildings in the neighborhood and Town (such as but not limited to: building materials, screening, breaks in roof and wall lines, adequate light, air circulation and separation between buildings). 





 (e) The adverse effects on abutting lots, the immediate neighborhood and the Town of Marblehead are minimized including (such as but not limited to: conflicts between residential, commercial and industrial uses, obstructions of views, increases in use of Town services and impact on Town infrastructure)(emphasis supplied). [Note 1] 





 In sum, the parties reserved for trial and for findings of fact by the court, consideration of whether the architectural and design features of the Project were in harmony with the prevailing character and scale of buildings in the neighborhood with respect to "adequate light, air circulation and separation between buildings" and whether the adverse effects on abutting lots, the immediate neighborhood and the Town of Marblehead were minimized with regard to "obstruction of views." After receipt of transcripts and the filing of post-trial memoranda from both the Epsteins and the Jacobs, closing argument was held via zoom on July 29, 2020, and I took the matter under advisement. 





FACTS 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, my view of the Project site and the Epsteins' property on Crown Way (including an interior view), and my assessment as the trier of fact of the credibility, weight and inferences reasonably to be drawn from the evidence admitted at trial, I make factual findings as follows: 





 The Parties, the Properties and the Neighborhood 





1. Jay and Ellen Epstein hold legal title to real property known and numbered as 9 Crown Way, Marblehead ("Epstein Property"), in their capacities as trustees of the Rosalyn P. Epstein Irrevocable Trust. Revised Joint Pretrial Memorandum, Agreed Statement of Facts, ¶ 1 ("SOF"). Jay and Ellen grew up at 9 Crown Way, but neither lives there now. They are co-trustees for the Epstein Property where their elderly mother lives with round-the-clock care. Tr. Vol. II, pp. 87-89, 125. 





2. Jacobs holds legal title to real property known and numbered as 11 Crown Way, Marblehead (the "Jacobs Property or "Locus"). SOF, ¶2. The Epstein Property comprises approximately 17,000 square feet, has approximately 100 feet of frontage on Crown Way, and shares a boundary line with the Jacobs Property. SOF, ¶22. 





3. The Jacobs Property is located in the Shoreline Single Residential District in the Town of Marblehead ("SSR District"). SOF, ¶ 10; Tr. Ex. 2. 





4. The Jacobs Property is located on the waterfront, with a seawall between its southern bound and the Atlantic Ocean. SOF, ¶ 15. The existing conditions include a single-family dwelling, a detached garage or carriage house, a swimming pool and other site improvements. Tr. Ex. 2. 





5. The Epstein property and the Jacobs property are adjacent to one another on Crown Way. Both the Existing House at 11 Crown Way, and the garage/carriage house, are pre-existing non-conforming structures. Tr. Exs. 2, 5. The Existing House does not meet the minimum side yard setback side requirement of the Bylaw and exceeds the maximum height limitation. The height of the Existing House is about 40 feet tall, with three- and one-half stories (and basement), and is set back only 14.6 feet from the Epstein property. Tr. Ex. 2; Tr. Vol. I, pp. 79, 90; SOF, ¶ 20. 





6. The Jacobs Property has a lot area of 24,773 square feet, well in excess of the Bylaw minimum lot area requirement of 10,000 square feet for the SSR District, and 120 feet of frontage on Crown Way, also in excess of the Bylaw minimum requirements. The Existing House has a gross floor area of approximately 11,036 square feet, excluding the existing garage or carriage house. This results in an open space ratio of 1.39 for the Existing House and Lot (or 1.39 square feet of lawn for every 1 square foot of house). SOF, ¶¶ 11, 13; Tr. Vol. I, pp. 79, 101-102. 





7. The garage or carriage house, located close to the ocean's edge and away from Crown Way, does not meet the minimum side yard or rear yard setback requirements of the Bylaw and also exceeds the maximum height limitation. Tr. Ex. 2. It is being renovated within its existing footprint to include bedrooms, bathrooms and living areas, which renovations are not challenged by the Epsteins.





8. A carport is the closest portion of the Existing House to the Epstein boundary, running between 15.2 and 14.6 feet from the boundary line and 42 feet from the Epstein house. Tr. Ex. 3; Tr. Vol. I, p. 92. 





9. The rear of the Epstein house faces toward the southerly cove, while its entrance is located on Crown Way on the north of its lot. No portion of the Epstein property borders the ocean or the seawall. The Epstein house is oriented toward the ocean so as to maximize views from the rear façade and southeasterly toward the ocean and cove. SOF, ¶¶ 26, 27; Tr. Exs. 6AE, 6AD; observations from view. 





10. The Epstein property does not have the benefit of a view easement over the Jacobs Property. However, the Epstein property does have indirect views of the ocean - in part across the Jacobs Property to the east, and in part toward the ocean and marsh across the property of other neighbors to the south whose land hugs a southeasterly cove. SOF, ¶ 32. There are two view corridors toward the ocean: one from the side of the house toward the southeast over the Jacobs' property at 11 Crown Way (the "Side Façade" and "Side View Corridor") and another from the rear of the house to south/southwest over the shore and the cove (the "Rear Façade.") On the Side Façade, there are five narrow windows facing the Jacobs' Property, two of which are on the first floor and three of which are on the second floor. The Rear Façade includes six (6) large bay windows or glass doors. The remaining two façades (front entrance facing Crown Way and northwest side façade) do not have ocean views and are unaffected by the proposed Project. SOF, ¶¶ 26, 27, 29, 30; Tr. Exs. 6A-6AF; observations from view. 





11. From the Side Façade, the Epsteins' view toward the ocean is currently framed to the east by a deck of 588 square feet on the rear of the Existing House and the garage/carriage house to the west. The deck extends twelve feet from the Existing House, raised eight- and one-half feet above ground with a railing of three feet. Tr. Vol. I, pp. 94-96; Tr. Ex. 6A. The Proposed Project, The Bylaw, and the Decision 





12. Jacobs purchased 11 Crown Way in September of 2018 as a "forever house" to share with his new wife, Jacobs' two sons and three step-daughters, and hopefully someday with grandchildren as well. Although only the youngest of Mr. Jacobs' stepdaughters lives with the couple (only when she is not away at college), the couple envision the house as a place where all their adult children can spend time together as a blended family. The couple chose to demolish the Existing House which was built in the 1800's and begin anew because the layout of the Existing House was not well-suited to this purpose. Tr. Vol. I, pp. 47-51. 





13. Jacobs and his wife engaged architect Jeffrey M. Tucker, Tucker Architecture & Landscape, LLC. ("Tucker"), to design their new house. They wanted all of the children's bedrooms to be equitable and on a single floor, each with its own en suite bathroom. This program resulted in a design which is longer from its eastern to its western facades than the Existing House, it is rotated on the site compared to the Existing House and increases obstructed ocean views from the Epstein house. After conferring with Tucker, Jacobs chose not to locate the house closer to the ocean because that would have further obstructed views from the Epstein property, even though conforming with the Bylaw. Tr. Vol. I, pp. 51-60. 





14. On or about January 16, 2019, Jacobs submitted the Application for Site Plan Special Permit proposing, among other things, demolition and removal of the Existing House and the construction of a new single-family home on the Property. SOF, ¶3; Tr. Ex. 2.





15. As part of the Application, Jacobs filed a set of plans prepared by Patrowicz Land Development Engineering, dated January 16, 2019 ("Patrowicz Site Plan"). Sheet 1 is titled "Existing Conditions Surveyed Plan of Land (with Demolition Notes) to Accompany a Site Plan Application to the Marblehead Planning Board." Sheet 2 is titled "Site Plan Proposed Scope of Work to Accompany a Site Plan Application to the Marblehead Planning Board." SOF, ¶ 4; Tr. Vol. I, pp. 82-86. 





16. Also included with the Application were a set of architectural plans prepared by Tucker Architecture & Landscape, titled "For Planning Review - Robert and Shereen Jacobs," dated January 15, 2019 and consisting of a cover and seven sheets ("Tucker Architectural Plans"). SOF, ¶ 5; Tr. Vol. I, pp. 82-86. 





17. The Board held a hearing on Jacobs' Application on March 12, 2019 and voted to approve the Application. On April 23, 2019, the Board issued a Decision approving the Application. SOF, ¶¶ 5, 6, 8; Tr. Ex. 5. 





18. The Application proposed to maintain the garage/carriage house and swimming pool in their current locations. The proposed Project would renovate the garage/carriage house and bring it up to code but did not otherwise modify its location or configuration. No zoning relief was requested for the garage/carriage house. Tr. Ex. 2 





19. The Project, as proposed, is only two stories (plus basement), reduced from three and one half stories, with a maximum building height of 29.8 feet, reduced from approximately 40 feet for the Existing House, and will conform with the maximum building height in the SSR District at 30 feet. SOF, ¶¶ 13, 14, 18,19, 23. 





20. The Project is smaller than the Existing House and includes more open space on the lot. The proposed house is rectangular in shape, rather than the squarish shaped Existing House (with respective dimensions of 99 feet by 42 feet, compared with 88 feet by 83 feet). The proposed Project will have a gross floor area of 8,130 square feet (and footprint of 3,593 square feet), compared with the Existing House which has a gross floor area of approximately 11,036 square feet (and footprint of 4,387 square feet)(both excluding the existing garage or carriage house). The proposed Project will have an open space ratio of 1.87, compared with an open space ratio of 1.39 for the Existing House and Lot. SOF, ¶¶ 10, 11, 13; Tr. Vol. I, p. 101-102, 107-108; Tr. Exs. 2, 4. 





21. The Project as proposed would be set back 25' 7" from the Epstein property, an increase of ten feet in the side yard setback from the Epstein property compared with the existing conditions with a setback of only 14.6 feet and in compliance with the Bylaw requirement of 25 feet, opening up air and light into the Epstein house. The side setback requirement in the SSR District is 25 feet for side yards. SOF, ¶¶ 20, 21, 23, 24 & 31; Tr. Vol. I, p. 132- 133. 





22. The proposed Project complies with all the setback and other dimensional requirements of the Bylaw. No zoning relief was required for the Project. SOF, ¶¶ 21, 23, 24 & 31; Tr. Vol. I, pp. 81, 90. 





23. The proposed Project will extend 8.5 feet toward the ocean past the existing deck. This alters the Side View Corridor Façade between the new house and the garage/carriage house but does not eliminate the ocean view. The Side View Corridor measures 46 feet, 5 inches, compared with exiting conditions view corridor of 55 feet, a reduction of 8.5 feet. Tr. Vol. I, p. 121. 





24. View studies by Tucker show the impact on ocean views from the windows on the South Façade. No view is eliminated entirely. All windows will continue to have an ocean view and views from the Rear Façade are untouched. In addition, although the windows on the South Façade will lose a portion of their ocean views, they will gain views toward Crown Way, with increased light, air and open space visibility. Tr. Vol. I, pp. 121-124, 147-148; Tr. Vol. II, p. 107; Tr. Exs. 15, 16. 





25. For instance, a study by Tucker from one particular vantage point on the first floor of the South Façade and looking through a window, shows before and after depictions and illustrates a loss of less than fifty percent of view. Exs. 6R and 21. Another study by Tucker from the second floor of the South Façade shows a fifty percent loss of ocean view, however, much more of the ocean would be visible from this location but for a large leafy green tree on the Epstein property which obstructs a sizable portion of the view. Exs. 6U and 22. As evident from the many photographic exhibits and the view, ocean views through the Side View Corridor are already substantially impeded by the existing garage/carriage house, whose massing would remain unchanged. Tr. Exs. 6A-6AF. 





26. Each of the five windows on the Side Façade of the Epstein house will continue to have a view if the Project is constructed. However, the Project as proposed will narrow the view of the ocean from the windows on the Side Facade. SOF, ¶¶ 9, 30. 





27. The proposed Project will not be visible from the Rear Façade of the Epstein house and will not alter the views from the windows and glass doors from the Rear Façade of the Epstein house. SOF, ¶¶ 27, 28, 30. 





28. I conclude based on Tucker's view studies, as well as those prepared by the Epsteins' expert witness Michael Novak, my view of the two properties (including a view from inside the Epstein house), and other evidence in the record, that the totality of lost ocean views from the Epstein property is limited or minor.





29. If Jacobs had wanted to renovate the Existing House, rather than raze it and rebuild, he could build an addition in the area of the deck of not more than 500 square feet atop the deck as-of-right without site plan approval (essentially enclosing most of the deck area), obstructing views from the Epstein house. Alternatively, a two-story addition in the general location of the existing deck could be built as-of-right with 250 on each of the first and second floors, also obstructing views from the Epstein house. Tr. Vol. I, pp. 95-99. 





30. Jacobs, with the assistance of Tucker, minimized the impact of the proposed Project on the Epstein property and the immediate neighborhood in several ways. The new house could have been built downhill and closer to the ocean and the swimming pool, while still meeting Bylaw requirements. Extending a portion of the house toward the water would have enabled Tucker to deliver a design with six bedrooms, each with a water view, but Jacobs chose not to proceed in that direction (even though two bedrooms lack ocean views as proposed), because to do so would have caused a greater loss of ocean views from the Epstein house. I credit Tucker's testimony siting the new house closer to the ocean would have resulted in a preferable design, with better views from Jacobs' new house and a better relationship between the house and swimming pool area. I also credit Jacobs' testimony that he chose not to do so in order to avoid a greater loss of ocean views from the Epstein Property. Tr. Vol. I, p 130-131, 158-161. 





31. The proposed Project will also provide some benefit to the immediate neighborhood. By lowering the height by almost eleven feet, reducing the massing and rotating on the site, the new house no longer walls off the street from water views and provides more light, air and visual access along Crown Way. The proposed Project also provides somewhat improved views for the properties across Crown Way. Tr. Vol. I, p 130-134.





32. The proposed Project is beneficial to the Town because it conforms with all Town zoning standards, thereby reducing non-conformities. In addition, although not disputed, the proposed Project manages groundwater from the site, mitigating an existing runoff problem. Tr. Vol. I, p 130-131. 





33. The Decision made Specific Findings beyond tracking the language of Section 200-37, including, inter alia: 





 1. The architectural and design features are in harmony with the prevailing character and scale of buildings in the neighborhood and Town (such as but not limited to: building materials, screening, breaks in roof and wall lines, adequate light, air, circulation and separation between buildings). The building has been designed with materials that reflect traditional New England seaside materials in a contemporary form. The new house will be oriented differently toward the water and pulled away from the street similar to an existing house on the street. The existing house has several dimensional nonconformities. The new building will conform to all required setbacks. The GFA is being reduced from the existing building by 2, 258 square feet; there is a corresponding increase in the Open Space Ratio from 1.48 to 1.87; the building height is being reduced from the current 39.3 feet to a conforming 29.8 feet. 





 2. The proposed house has been sited to expand the public view corridors by increasing the side yard setbacks to what is required within the shoreline districts. 





 3. The proposed residence is replacing an existing home that is with a careful attention to architectural scale and form. 





 4. External emissions are those customarily associated with a single-family house, which will not change. Zero percent increase in impervious area and runoff. 





 5. Vehicular and pedestrian movement within the site is convenient and safe.... The driveway will be maintained in a similar location as existing driveway. 





 Tr. Ex. 5 





34. The Decision imposed a number of conditions on the approved Site Plan. In particular, as pertinent to the Epsteins' appeal, the Board required the Project be substantially constructed in accordance with the Tucker Architectural Plans and the Patrowicz Site Plan. It also made the Decision subject to an order of Conditions from the Conservation Commission and incorporated two requests of the Town Conservation Commission: to maintain the ratio of impervious area on the site and adds a catch basin and piped leaching system in order to ensure any post-construction runoff is retained on site. Tr. Ex.'s 2, 5. 





35. I find the Decision adequately protects the public interest to a degree consistent with the reasonable use of the Jacobs Property for a single-family residential use. 





DISCUSSION 





 Notwithstanding the fact that "the Zoning Act, G. L. c. 40A, does not specifically recognize site plans as an independent method of regulation ... the use of site plan approval as a permissible regulatory tool for controlling the aesthetics and environmental impacts on land use has [long] been recognized." Dufault v. Millennium Power Partners, L.P., 49 Mass. App. Ct. 137 , 138-139, (2000); See Y. D. Dugout, Inc. v. Board of Appeals of Canton, 357 Mass. 25 , 29-31, (1970). "Site plan review has to do with the regulation of permitted uses, not their prohibition." Bowen v. Bd. of Appeals of Franklin, 36 Mass. App. Ct. 954 , 955 (1994); Osberg v. Planning Bd. of Sturbridge, 44 Mass. App. Ct. 56 , 57-59 (1997). "[I]f the specific area and use criteria stated in the by-law [are] satisfied, the board [does] not have discretionary power to deny . . . [approval], but instead [is] limited to imposing reasonable terms and conditions on the proposed use." Prudential Ins. Co. of Am. v. Bd. of Appeals of Westwood, 23 Mass. App. Ct. at 281-282, (quoting SCIT, Inc., v. Planning Bd. of Braintree, 19 Mass. App. Ct. 101 , 105 n.12 (1984)). To that end, it is within a Board's "discretion to impose reasonable conditions under a by-law's requirements in connection with approval of a site plan, even if the conditions are objected to by the owner or are the cause of added expense to the owner." Prudential Ins., supra, 23 Mass. App. Ct. at 283, n. 9. 





 A court reviewing a local board's site plan decision, finds facts on a de novo basis. Id. at 282. Having found those facts, the inquiry before the court is limited. Most commonly, appeals of site plan decisions occur where a local board has denied site-plan approval. In such circumstances and where an as-of-right use or structure is involved, the court may uphold that denial only if the problem prompting the denial is "so intractable that it could admit of no reasonable solution." Id. at 283. A reviewing board exceeds its authority if it imposes conditions that amount to a denial of an allowed use. Castle Hill Apartments Ltd. P'ship v. Planning Bd. of Holyoke, 65 Mass. App. Ct. 840 , 844 (2006). 





 Here, in contrast, the Epsteins challenge the approval of a site plan special permit for an as-of-right use. The Epsteins do not contend that the Board entertained "any standard, criterion or consideration not permitted by the applicable statutes or bylaws." Muldoon v. Planning Bd. of Marblehead, 72 Mass. App. Ct. 372 , 374 (2008) (quoting Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 73 (2003)). Rather, the Epsteins contend that the Decision is legally untenable because the Board failed to make adequate findings and that the conditions were not adequate. In such instances, the questions for the reviewing court are limited to whether the local board's conclusion that the site plan met the applicable local criteria for its approval was based on legally tenable grounds and whether that conclusion was unreasonable, whimsical, capricious, or arbitrary. See Mechanicwillow, LLC. v. Evans, 28 LCR 587 (Misc. Case No. 18 MISC 000183) (2020) (Vhay, J.); See also Conlon v. Rosa, 16 LCR 754 , 756 (2008) (Long, J.); See also Lee v. Sampson, 25 LCR 376 (2017) (Cutler, C.J.) (invalidating site-plan approval for an as-of-right use where site plan did not meet bylaw's requirements). 





 I. Adequacy of the Findings of the Board 





 The Epsteins argue that the Decision is legally untenable because the Board did not make sufficient findings to support the Decision. I conclude to the contrary. In the first instance, as the Appeals Court has explained, because "site plan review has to do with regulation of permitted uses, not their prohibition, as would be the case with a special permit or a variance ... the local board need not be held to as demanding a standard of reporting of the factual and legal underpinnings of their approval of a site plan." Bowen, supra, 36 Mass. App. Ct. at 955. Moreover, the Decision included sufficiently detailed findings and also imposes conditions on the Project. 





 Five Specific Findings, as set forth above, do more than recite the language of Section 200-37. They address the two criteria here at issue, whether there was adequate light, air circulation and separation between buildings and whether the adverse effects on abutting lots, the immediate neighborhood and the Town were minimized with regard to obstruction of views. For instance, Specific Finding 1 notes that the new house will be oriented differently toward the water and pulled away from the street similar to an existing house on the street. It goes on to note that although the existing house has several dimensional nonconformities, the new building will conform to all required setbacks, the gross floor area is being reduced from the existing building by 2,258 square feet, with a corresponding increase in the Open Space Ratio from 1.48 to 1.87 and a reduction in the building height from the current 39.3 feet to a conforming 29.8 feet. With respect to adverse effects on the abutting lots including obstruction of views, Specific Finding 3 concludes that the proposed residence is replacing an existing home with a careful attention to architectural scale and form. While the Epsteins may disagree with those finding and argue the Project could have been designed with more attention to their ocean views, that disagreement does not negate the Board's finding that the design and siting were careful. The Decision also included several conditions, the most salient of which relative to the Epsteins' appeal, is that the Project be constructed substantially in accordance with Tucker Architectural Plans filed with the Application, as well as the Patrowicz Site Plan. Those plans run more than a dozen pages and in addition to floor plans include elevations, landscape plans, site overviews (existing and proposed). It is noteworthy that "the detailed conditions imposed by the zoning board do double duty as findings that the special permit applied for might be exercised in harmony with the general purpose and intent of the zoning by-law." Tebo v. Bd. of Appeals of Shrewsbury, 22 Mass. App. Ct. 618 , 621 (1986). Based on the foregoing, I find that the Decision contains sufficient findings as a matter of law. 





 II. Reasonableness of Decision 





 Jacobs' Application for a site plan special permit is governed by Section 200-37 of the Bylaw, which requires site plan approval of certain projects in the Town's Shoreline Districts and includes the SSR District. The criteria for site plan approval are set forth in Section 200-37(C) (3) of the Bylaw. Because Jacobs' Application is related to a use as of right, the Board had no discretionary power to deny the Application, nor do the Epsteins suggest that the Board should have done so. Instead, the Epsteins contend that the Board should have imposed more stringent or supplemental conditions on the Project to safeguard the ocean views from 9 Crown Way. As discussed above, the parties filed a Stipulation on the first day of trial narrowing the issues for trial. As so focused, the Epsteins contend that in approving the Project, the Board failed to adequately consider whether the architectural and design features of the Project were in harmony with the prevailing character and scale of buildings in the neighborhood with respect to "adequate light, air circulation and separation between buildings" and whether the adverse effects on abutting lots, the immediate neighborhood and the Town of Marblehead were minimized with regard to "obstruction of views."





 As discussed below, I conclude that the evidence at trial did not support a finding that there the Board's Decision was unreasonable, arbitrary or capricious with respect to those two concerns. The Epsteins concerns arise in the context of the following portions of the criteria for site plan special permits within Subsections 3 (a) and (e) of Section 200-37 C, highlighted to emphasize the disputed portions in the parties' stipulation: 





 (a) The architectural and design features are in harmony with the prevailing character and scale of buildings in the neighborhood and Town (such as but not limited to: building materials, screening, breaks in roof and wall lines, adequate light, air circulation and separation between buildings). 





 (e) The adverse effects on abutting lots, the immediate neighborhood and the Town of Marblehead are minimized including (such as but not limited to: conflicts between residential, commercial and industrial uses, obstructions of views, increases in use of Town services and impact on Town infrastructure)(emphasis supplied). 





 Jay and Ellen Epstein both testified at trial. They are brother and sister and grew up at 9 Crown Way. Jay testified that his parents bought the 9 Crown Way property in 1964 and built their house in 1965. Neither Jay nor Ellen live at 9 Crown Way now but are co-trustees of the trust which owns the property where their elderly mother lives with round-the-clock care. The Epstein parents built the house to maximize ocean views and now the Epsteins contend that the Board did not do enough to mitigate negative impacts on 9 Crown Way arising from the construction of Jacobs' new home. They are particularly focused on their perception that their family home will lose significant ocean views with a corresponding loss of property value. For instance, Jay expressed concern that his mother would lose some portion of the view from a window where she sits to play piano. As Jay testified: "We just don't want an adverse effect on our mother's property. It's not a lot to ask." Tr. Vol. II, p. 111, 133-134. 





 Michael Novak, a licensed civil engineer and Vice President of Meridien Associates, testified on behalf of the Epsteins as an expert witness ("Novak"). Novak testified that the loss of ocean views would be greater than portrayed by Jacobs' architect Tucker. To support this conclusion, Novak prepared a Viewshed Analysis Sketch showing a compilation of lost ocean views from the vantage point of windows on the Side Façade using GPS and laser technology to develop a LIDAR (light detection and ranging survey) computer model to depict three dimensional views from the Epsteins' house under existing conditions compared with those with the Project constructed. Relying on Novak's LIDAR study (See Exhibit 12), the Epsteins contend that up to approximately one half of the views from two of the five windows on the Side Façade will be lost. They do not dispute that views from the Rear Façade will be undisturbed. 





 Tucker also undertook view studies showing the impact on ocean views from the windows on the South Façade of the Epstein House. [Note 2] Those studies show somewhat less loss of views than Novak's study. However, both experts agree that none of the windows on the Side Facade would lose its entire view when the Project is built. As Tucker pointed out during his testimony, although each of the five windows on the South Façade would lose a portion of its ocean view when the Project is constructed, those five windows also gain views toward Crown Way, with increased light, air and open space visibility, because the side setback of the Project would be increased. For instance, a study by Tucker from one particular vantage point inside the Epstein first floor on the South Façade and looking through a window, showing before and after depictions, illustrates that one window would lose less than fifty percent of its view (Exs. 6R and 21). Another study by Tucker from a window on the second floor of the South Façade shows a fifty percent loss of ocean view, however, much more of the ocean would be visible from this location, but for a large leafy green tree on the Epstein property which obstructs a sizable portion of the view (Exs. 6U and 22). 





 Based on my observations during the view and the many photographic exhibits, as well as the testimony and models of Novak and Tucker, I am convinced that the loss of ocean views resulting from the Project would be more than "tiny" as Novak phrased it, but only slightly so. Careful review of the two studies illustrated that each individual photographic or modeled image is static and the amount of visible ocean view will vary depending on the specific location where someone stood within a room looking out that window, on their orientation and distance from the window. Nonetheless, both models were useful in understanding the extent of existing views and future obstructions from the narrow windows on the Side Façade. I am persuaded that the loss of ocean views from that Side Façade is minor because the ocean views through the Side View Corridor are already substantially impeded by the existing garage/carriage house (whose massing is not changing since only interior renovations are proposed), and by the leafy tree on the Epstein property. In concluding that the total loss of views from the Epstein house would be minor, it is significant the parties and their experts all concur that ocean views from all of the larger glass doors and windows on the Rear Façade will be untouched. As such, the loss of views is limited to the windows on one of four façades - the Side Façade - and in every instance, some amount of an ocean view is maintained. 





 I also discount the Epsteins' challenge to approval of the site plan special permit because they are singularly focused on loss of ocean views and dismiss the value of increased light, air and open space visibility. While I appreciate the Epsteins' perspective, the Bylaw establishes a more nuanced and holistic standard for site plan special permits. Neither Subsection 200-37 C (3)(a) or (e) is singularly focused on views. I conclude that the proposed Project is well in keeping with the criteria in Subsection (a). As noted by the Board, the Project siting is similar to another house in the neighborhood and more compact and shorter in height than the Existing House. Those architectural and design features are in harmony with the prevailing character and scale of buildings in the neighborhood. Further, it is undisputed that the Project's reduced massing and increased side setback will improve light and air circulation between 9 and 11 Crown Way. I also find that the Project will improve light and air circulation for the immediate neighborhood by its modified massing and its reorientation from the Existing House which walls off ocean views from the street. 





 I turn now to Subsection (e), which does direct consideration of obstruction of views, among other factors. The Epsteins repeatedly argued that the Decision was flawed because the Project would result in more than a minimal loss of their ocean views. The question before the court, however, is not whether the Epsteins would experience a minimal loss of ocean views or whether the Project would have a minimal impact on the Epsteins' views. Subsection (e) concerns whether adverse effects on all views are "minimized" by the Project's design, not just ocean views. Here again, the Bylaw sets forth a holistic standard requiring consideration of adverse view impacts on the immediate neighborhood (not just on abutting lots), and consideration of adverse impacts generally (not just obstructions of views). [Note 3] 





 In considering whether adverse effects are minimized, I turn to Novak's testimony about several possible modifications to the proposed Project that would have less impact on the Epsteins' views. His ideas included changing the footprint of the house, moving the house closer to Crown Way and possibly rotating the house to an orientation more like that of the Existing House. [Note 4] In the first instance, Novak's suggested design alternatives were speculative in nature; when pressed Novak conceded that he had not fully evaluated these options, and could say no more than that these ideas might potentially prove to have less of an impact on the Epsteins' ocean views. Tr. Vol. II, pp. 35-39, 59-64. Tucker rebutted Novak's alternative design ideas, explaining that had considered the options but concluded it was impossible to implement then while satisfying Jacobs' programmatic requirements for their new home. 





 Novak's ideas correspond with the Epsteins' testimony that would have liked to have input into the design of the Project. Novak's critique of the proposed Project and the Epsteins' desire to participate in the process of designing the Project miss the mark in terms of the question before the court. Although it might have been neighborly for Jacobs to confer with the Epsteins during the design process, the Bylaw does not so require. Jacobs is entitled to develop his own programmatic needs for the new home and to make choices about the design of the home even if those choices are not to the Epsteins' liking and even if it the Project could have been designed more to the Epsteins' liking. 





 I conclude the Project design does minimize impacts on the Epsteins' property, as well as impacts on other abutters and the immediate neighborhood. I credit Jacobs' testimony that he chose not to locate the new house closer to the ocean after conferring with Tucker because to do so would have further obstructed views from the Epstein property, while still meeting Bylaw requirements. Tucker credibly corroborated this testimony. From my view of the site, the Petrowicz Site Plan, aerial photographs and the expert testimony, I further conclude that siting the new house closer to the ocean would have caused an even greater loss of ocean views from Epstein property. Jacobs chose not to proceed in that direction even though a closer siting would have had benefit to Jacobs (proximity to the ocean and swimming pool and enabling Tucker to deliver a design with six bedrooms with water views instead of four). On cross-examination, Novak agreed that if Jacobs had availed himself of the option to locate his new house closer to the ocean and the swimming pool, the obstruction to the Epsteins would have been even worse. This siting decision alone warrants a conclusion that the Project minimized adverse impacts on the Epsteins and comfortably satisfies Subsection (e). 





 In addition, Tucker's testimony addressed impacts on the Crown Way neighborhood. He undertook a series of view corridor studies for the Crown Way neighborhood, comparing existing horizontal view corridors with those with the proposed Project in place. Although the study does not permit detailed conclusions about how the Project would impact the view from each window of each house on Crown Way, it was sufficiently detailed to enable me to conclude, in conjunction with observations during my view, that by and large existing views would not be impacted for houses located across and along Crown Way (at 10, 12, 12 Carriage House and 14 Crown Way, as well as Jacobs' abutter to the south at 9 Crown Way) and would be slightly improved with respect to increased air, light and open space. Three properties would lose small slivers of their views (10, 12 and 12 Carriage House Crown Way), while 12, 12 Carriage House, 14 and 15 Crown Way would gain view corridor, some possibly with ocean views. I credit Tucker's study and his conclusion that the Project design minimizes the impact on the neighborhood based on based on Tucker's familiarity with the Crown Way neighborhood, his training as both architect and landscape architect, the quality of the study, and his credible, detailed and straightforward responses on cross-examination. When questioned, Tucker thoughtfully explained how the impact on neighboring homes had been minimized by the design, including for instance his concurrence that the Epsteins might prefer to see more of the ocean while also standing firm that expanded light and view corridors were also a positive change. Overall, I conclude the loss of views in the neighborhood would be minimized and fairly equitably distributed amongst the neighboring properties. The Board's Decision to approve Jacobs' Application for a Site Plan Special Permit was neither unreasonable nor arbitrary and capricious. In addition, as noted in the Decision, there would also be benefit to the Town because the proposed Project would fully conform to all the existing zoning requirements and eliminated a number of existing non-conformities eliminated. See Bransford v. Zoning Bd. of Appeals of Edgartown, 444 Mass. 852 , 859 (2005) ("the ultimate objectives of zoning [are] furthered by the eventual elimination of nonconformities"). 





 Real estate appraiser Steven Ozahowski also testified on behalf of the Epsteins. [Note 5] He testified that in his opinion 9 Crown Way would lose between five and eight percent of its market value as a result of the diminished ocean views. This testimony does not change my conclusion that approval of the Site Plan Special Permit was warranted for several reasons. In the first instance, diminution of property value is a not consideration included within Section 200- 37. To the contrary, in Subsection (e), the Bylaw provides specific examples of what is meant by "adverse effects" - adverse effects encompass such things as "conflicts between residential, commercial and industrial uses, obstructions of views, increases in use of Town services and impact on Town infrastructure." These examples are far afield from loss of property value and relate design elements. There is no basis to imply a new criterion of lost value into the Bylaw and a planning board "is forbidden from entertaining any 'standard, criterion or consideration not permitted by the applicable statutes or by-laws.'" Muldoon, supra, 72 Mass. App. Ct. at 374 (quoting Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 73 (2003). In addition, Ozahowski acknowledged at trial that he had not undertaken two real estate appraisals (one as-is and a second reflecting construction of the proposed Project) as would be necessary in order to accurately quantify a negative impact on value. Tr. Vol. II, 151 -152. The lack of comparative appraisals or professionally prepared comparable analysis undermined the reliability of Ozahowski's testimony and his credibility. It is not reasonable or convincing to simply conclude as Ozahowski did that when it comes to views, "More is better." Lastly, Ozahowski conceded on cross-examination that he would not characterize the loss of value as major. I conclude that the Project satisfied the criteria of Section 200-37 and minimized adverse impacts on the Epstein property. 





CONCLUSION 





 For these reasons, the Decision of the Planning Board is upheld. Judgment will enter accordingly. 





FOOTNOTES
[Note 1] In the Stipulation, the parties agreed their dispute excluded the remaining criteria, as follows: 



 (1) The general purpose and intent of the Bylaw; 





 (2) The technical requirements of Section 200-37; 





 (3) The extent to which: ...(b) The character of the site is preserved (such as but not limited to: protection for historical and natural resources and existing terrain, minimization of grade changes, tree and soil removal); (c) Vehicular and pedestrian movement within the site are convenient and safe (such as but not limited to: traffic patterns, circulation, location of driveway openings, parking, loading, access by emergency vehicles, and visibility of and identity of street address numbers); (d) External emissions from the site are minimized or eliminated (such as but not limited to: erosion, surface water runoff, pollution, sewage, disposal of refuse, odors, noise, glare, light and any other environmental impacts).



[Note 2] Tucker is a both a registered architect and a registered landscape architect. He has extensive experience with designing residential housing in Marblehead and is knowledgeable about its Bylaw, including the site plan special permit process. 

[Note 3] Subsection 200-37(e) requires that "the adverse effects on abutting lots, the immediate neighborhood and the Town of Marblehead are minimized including (such as but not limited to: conflicts between residential, commercial and industrial uses, obstructions of views, increases in use of Town services and impact on Town infrastructure). 

[Note 4] Novak disagreed with Tucker's conclusion that the proposed Project had been located as close to Crown Way as possible and testified that pushing the house toward Crown Way would preserve views for the Epsteins. Novak and Tucker disagreed about whether the Bylaw required a twenty-foot frontyard setback from Crown Way or a twenty five-foot frontyard setback. Novak opined that a setback of twenty-five feet from Crown Way was required by the section of the Bylaw governing frontyard setbacks in the SSR District, § 200-9, rather than a twenty-foot setback as reflected in Tucker's design. I need not resolve this dispute because the law does not require Jacobs to do everything possible to minimize impacts to his neighbors. 

[Note 5] On the first day of trial, the court heard argument on Jacobs' Motion in Limine seeking to exclude testimony from Ozahowski as unreliable and lacking an adequate foundation because Ozahowski had not timely performed an appraisal of the Epsteins' property or identified comparable sales of similar properties. That motion was denied in part, excluding work performed by Ozahowski after the close of discovery on December 31, 2019 (and his deposition of that same day) as prejudicially unfair, since that work product was not timely disclosed. See Palmier v. Ahearn, 91 Mass. App. Ct. 1116 (2017). Although Ozahowski was permitted to testify about loss of value, the absence of an appraisal or comparability analysis was taken into consideration relative to his credibility and the reliability of his testimony. "Ordinarily a real estate dealer or appraiser may testify as to the value of property, whether or not he has seen it or sold land in the neighborhood, if he possesses sufficient experience and knowledge of values of other similar real estate in the particular locality." Lee Lime Corp v. Massachusetts Tpk. Auth., 337 Mass. 433 , 436 (1958); See Nichols v. Grossman, 25 LCR 317 (2017) (Misc. Case. No. 94 MISC 202844) (Sands, J.) (allowing Ozahowski's testimony about diminution of value of the property at issue but finding it unreliable because he did not perform a formal appraisal, analyze comparable properties or take into consideration other factors that might affect an appraisal). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.